IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| | | |
|---|---|---|
| JESSICA FITZWATER, | ) | Case No. 1:20-cv-1456 |
| | ) | |
| Plaintiff, | ) | JUDGE JAMES R. KNEPP II |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF | ) | |
| SOCIAL SECURITY, | ) | |
| | ) | **REPORT AND RECOMMENDATION** |
| Defendant. | ) | |

Plaintiff, Jessica Fitzwater, seeks judicial review of the final decision of the Commissioner of Social Security, denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act. This matter is before me pursuant to 42 U.S.C. §§ 405(g), 1383(c)(3), and Local Rule 72.2(b). Because the Administrative Law Judge ("ALJ") applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Fitzwater's applications for DIB and SSI be AFFIRMED

**I.    Procedural History**

Fitzwater applied for DIB and SSI on October 18, 2017. (Tr. 239-248).[1] She alleged that she became disabled on August 15, 2012, due to: "1. Bulging Disk in Neck/Lower Back; 2. Tendinitis Left Shoulder; 3. Pain in Legs/Arms; 4. Depression; 5. Anxiety; 6. PTSD; [and] 7. Learning Disorder." (Tr. 239, 247, 274). The Social Security Administration denied

---

[1] The administrative transcript is in ECF Doc. 12.

Fitzwater's claims initially and upon reconsideration.  (Tr. 79-154).  Fitzwater requested an ALJ

hearing.  (Tr. 179-80).  ALJ Penny Loucas heard Fitzwater's claim on July 15, 2019 and denied

the claim in an August 8, 2019 decision.  (Tr. 13-78).  On May 27, 2020, the Appeals Council

denied further review, rendering the ALJ's decision the final decision of the Commissioner.

(Tr. 1-6).  On July 2, 2020, Fitzwater filed a complaint to obtain judicial review.  ECF Doc. 1.

## II.    Evidence

### A.    Personal, Educational, and Vocational Evidence

Fitzwater was born on April 29, 1984, and she was 27 years old on the alleged onset date.

(Tr. 239, 247).  She had a 12th grade education and graduated from high school in 2002.  (Tr.

275).  She had past work experience as: (1) a grocery store cashier; (2) general laborer;

(3) hospital house keeper; and (4) retirement home utility aid.  (Tr. 275).  Fitzwater stopped

working in December 2016, but the work she performed between the alleged onset date and her

last day of work did not amount to substantial gainful activity.  (Tr. 18, 274-75).

### B.    Relevant Medical Evidence

On August 8, 2012, Candace Lord, CNP, found that Fitzwater had a normal range of

motion in her neck, normal heart rate/rhythm, normal breathing, normal mood/affect, and normal

behavior.  (Tr. 391).

On June 12, 2013, Fitzwater told Gabriella Palma, MD, that she had a depressed mood,

crying spells, fatigue, changes in her sleep pattern, easy irritation, an inability to concentrate, and

mood changes.  (Tr. 424).  Fitzwater denied memory loss.  (Tr. 424).  Dr. Palma diagnosed

Fitzwater with anxiety disorder and depression, and she prescribed medications.  (Tr. 425).  At a

follow-up on September 11, 2013, Fitzwater said she felt well and denied myalgias.  (Tr. 420).

But she reported anxiety, depression, insomnia, frequent crying, inability to concentrate, and

mood changes.  (Tr. 420).

2

On May 7, 2014, Fitzwater told Aubrey Shearn, NP, that she had gradually worsening foot pain. (Tr. 416). She said movement made the pain worse but rest relieved it. (Tr. 416). Fitzwater reported associated muscle swelling, weakness, instability, ankle pain, difficulty wearing shoes, and difficulty climbing stairs. (Tr. 416). Examination showed swelling, tenderness, and decreased range of motion. (Tr. 417). Follow-up foot and ankle x-rays showed a large plantar heel spur, but the joint spaces and bony structures were otherwise preserved. (Tr. 352-53).

On June 12, 2014, Fitzwater went to the emergency department following a car accident. (Tr. 436). Christopher Wyatt, MD, noted that Fitzwater reported neck pain, back pain, and a headache. (Tr. 436). She had normal heart and lung function, no abdominal tenderness, no lesions, and no deformities. (Tr. 437). She could move all extremities symmetrically and equally to command. (Tr. 437). A CT scan showed no evidence of fracture or spinal injury, and a neurological examination was normal. (Tr. 437-40). Dr. Wyatt diagnosed Fitzwater with a cervical neck and thoracic back strain and sent Fitzwater home in stable condition. (Tr. 437-48).

On July 16, 2014, Fitzwater told Gabriella Palma, MD, that she had been in a car accident and had neck, back, and leg pain. (Tr. 414). Dr. Palma noted that an x-ray at the ER showed that her back and neck were normal, but she was sent home with a neck brace. (Tr. 414). Fitzwater said that walking made her leg pain worse and bending the knee or elevating her leg made her pain better. (Tr. 414). On examination, Fitzwater had normal strength, tone, sensation, and range of motion in her spine. (Tr. 415). Dr. Palma indicated that Fitzwater's reported pain with range of motion appeared subjective and not consistent with findings. (Tr. 415). At a follow-up on September 10, 2014, Fitzwater said she felt well, and Dr. Palma noted that she was cooperative, had normal breathing, and had normal heart rate/rhythm. (Tr. 409-10). On March 29, 2017, Fitzwater said her anxiety and panic attacks were unchanged and her medication didn't

help.  (Tr. 628).  But examination showed normal mood, affect, posture, gait, and station.  (Tr. 629).

On July 24, 2014, an MRI of Fitzwater's spine showed mild asymmetrical bulging or herniated nucleus pulposis to the left aft L5/S1 with associated annular tear.  (Tr. 350).

On August 11, 2014, Heather Folz prescribed Fitzwater Ultram after she had reported foot pain.  (Tr. 411).

On September 22, 2014, Melanie Golembiewski, MD, noted that Fitzwater reported depression, anxiety, and headaches.  (Tr. 387).  Examination showed normal neck range of motion, normal heart rate/rhythm, normal breathing, no edema or tenderness, no cervical adenopathy, normal reflexes, full orientation, normal mood/affect, normal behavior, normal judgment, and normal thought content.  (Tr. 387).  At a follow-up on December 1, 2014, Fitzwater said counseling helped her depression, and examination showed normal heart rate/rhythm, and normal breathing.  (Tr. 383-84).

On September 23, 2014, Fitzwater told Samir Shaia, DO, that she had low back pain that radiated down her left leg.  (Tr. 427).  Fitzwater said her pain was worse when sitting and walking.  (Tr. 427).  Examination showed severely antalgic gait, range restriction in the appendicular skeleton, normal range of motion in the neck, present and symmetric muscle stretch reflexes, no focal sensory defects, restricted lumbar range of motion, pain in the lower back, and no muscle atrophy or dystonia.  (Tr. 428).  Dr. Shaia gave Fitzwater an epidural steroid injection on September 26, 2014, and she said it relieved the pain in her left leg.  (Tr. 464).  On December 11, 2014, Fitzwater told Dr. Shaia that she had "nice relief" from her epidural steroid injection, but later had a gallbladder attack and wasn't able to have any more injections.  (Tr. 464).  Fitzwater said her back and leg pain and returned, but she denied having any weakness.  (Tr. 465).  Examination showed antalgic gait with motor deficits, and Dr. Shaia prescribed Vicodin

for her pain.  (Tr. 465).  On December 13, 2014, Dr. Shaia gave Fitzwater another epidural steroid injection, and she again reported being free of her lower extremity pain.  (Tr. 467).  On January 7, 2015, Fitzwater said she had two days of relief after her previous injection, but her left leg pain and numbness came back.  (Tr. 469).  Dr. Shaia gave Fitzwater a trigger point injection and prescribed a membrane stabilizer medication.  (Tr. 469).  On February 6, 2015, Dr. Shaia noted "marked improvement," and Fitzwater said that she was very pleased and didn't have much pain.  (Tr. 471).  Examination snowed non-antalgic gait, no acute distress, and no focal motor deficits.  (Tr. 471).  Dr. Shaia recommended that Fitzwater continue doing home exercises and continued her medications.  (Tr. 471).

On September 30, 2014, Fitzwater told Chelsea Peticca, LPC-CR, that she had anxiety and depression.  (Tr. 364).  Fitzwater reported having a history of emotional, physical, and sexual abuse; financial concerns; and relationship issues with her family.  (Tr. 364, 369).  Fitzwater said she had a hard time making friends.  (Tr. 365).  She said that she struggled learning new tasks, keeping up with others, and comprehending information.  (Tr. 366).  Fitzwater reported having sleep disturbance, lack of interest, guilt, lack of energy, trouble concentrating, changes in appetite, suicidal thoughts, muscular tension, fatigue, concentration difficulty, restlessness, and irritability.  (Tr. 370).  She said she had quick mood changes and a quick temper.  (Tr. 370).  Examination showed cooperative attitude, calm motor activity, clear speech, no delusions, no psychosis, logical thought process, depressed affect, unimpaired cognition, and average intelligence.  (Tr. 372-73).  Peticca diagnosed Fitzwater with major depressive disorder, generalized anxiety disorder, and PTSD.  (Tr. 375).  Peticca recommended weekly counseling and medication management.  (Tr. 375-76).

At a mental status examination on January 15, 2015, Fitzwater denied crying spells and said her feelings of hopelessness, anxiety, and appetite had improved.  (Tr. 377).  Fitzwater said

5

she still had nightmares.  (Tr. 377).  Her intelligence was estimated as average, and her social functioning was moderate.  (Tr. 377).

On March 17, 2015, Fitzwater told Dr. Golembiewski that she had been admitted to the hospital due to hallucinations, suicidal speech, and "shadows."  (Tr. 495).  Fitzwater also said that she had black outs, lost control of her hands, and nodded off.  (Tr. 495).  Examination showed normal range of motion, full orientation, normal heart rate and rhythm, normal mood and affect, normal behavior, normal judgment, and normal thought content.  (Tr. 496).  At follow-up appointments on March 17, 2015, November 9, 2015, March 30, 2016, May 10, 2016, and December 30, 2016, examinations showed normal range of motion, no edema/tenderness, full orientation, normal mood, normal affect, normal behavior, normal judgment, and normal thought content.  (Tr. 483, 490, 494, 496).

On September 19, 2016, Fitzwater told Sasha Yurgionas, MD, that she'd sprained her ankle, but kept working on her feet.  (Tr. 486).  Fitzwater denied having any back pain or myalgias.  (Tr. 486).

On December 19, 2016, Todd Hochman, MD, noted that Fitzwater said she was doing "a little bit better" with her pain.  (Tr. 905).  Fitzwater said that lifting objects made her pain worse, she needed to change positions frequently, her pain interfered with her cognitive abilities, and medications didn't alleviate all her pain.  (Tr. 907, 909).  Physical examination showed full orientation, no respiratory distress, "some midline discomfort" in the cervical spine, "some pain" in the scapula area, pain beyond 90 degrees range of motion in the shoulder, pain on range of motion in the ankle, tenderness in the ankle and spine, and wrist pain.  (Tr. 905).

In March 2017, MRIs showed disc bulges at C5/6, C6/7, and L5/S1, but there was not a significant amount of stenosis and no cord compression.  (Tr. 573).

On May 30, 2017, Fitzwater told Dr. Golembiewski that wearing any shoe caused pain, and muscle relaxers and ibuprofen didn't help. (Tr. 480). Fitzwater denied depression, anxiety, and insomnia. (Tr. 481). Examination showed that her spine and right foot were tender to palpation, but she had normal range of motion in her ankle. (Tr. 481). Dr. Golembiewski recommended physical therapy, weight management, and ice for her foot. (Tr. 481-82). At a follow-up on August 18, 2017, Fitzwater denied depression/anxiety, and examination showed normal range of motion, no edema, normal mood/affect, and normal behavior. (Tr. 478-79).

On May 31, 2017, Fitzwater saw Dr. Placeway for evaluation of her back and neck pain. (Tr. 574). Fitzwater said she'd had lower back pain for three years, and it got worse after a fall in December 2016. (Tr. 574). Fitzwater said she had completed physical therapy in September 2014 and March 2017 and walking up to half a mile aggravated her pain. (Tr. 574). Examination showed full range of motion in all extremities, normal gait, no soft tissue swelling, and full shoulder range of motion without pain. (Tr. 576-77). Dr. Placeway said that his impressions were lower back pain with left lumbar radiculopathy and neck and left arm pain with left cervical radiculopathy. (Tr. 577). Dr. Placeway prescribed Topamax, ordered MRIs, and directed Fitzwater to consider pain psychology. (Tr. 577). Follow-up examinations on June 5, June 20, August 25, October 4, and December 5, 2017, and March 28, 2018 showed normal range of motion in all extremities, normal gait, and tenderness in the spine and shoulder. (Tr. 553-54, 558, 568, 704, 791-92, 900-01). On December 5, 2017, Dr. Placeway referred Fitzwater to a chronic rehabilitation program so she could "resume normal function, regain physical strength and endurance, learn coping skills and stress reduction, and obtain psychological cognitive training." (Tr. 782).

On June 12, 2017, a CT of Fitzwater's spine showed degenerative spondylotic changes without acute fractures or traumatic malignment.  (Tr. 592).  An x-ray of her spine showed mild curvature to the left, but the vertebral bodies were maintained within limitations.  (Tr. 592).

On June 28, 2017, Fitzwater told Robert Jones, DO, that she had left neck pain, shoulder pain, and back pain.  (Tr. 563).  Fitzwater said that her pain radiated down her left leg, causing numbness and tingling.  (Tr. 563).  Examination showed no musculoskeletal trauma, no tenderness in the left shoulder, normal rotator cuff, stable shoulder, tenderness in the spine, and full strength in the lower extremities.  (Tr. 564).

On July 18, 2017, an MRI of Fitzwater's shoulder showed no soft tissue swelling, intact shoulder tendons, mild thickening of the biceps tendon, and no joint effusion.  (Tr. 590).  Findings were compatible with biceps tendinosis.  (Tr. 590).

An August 2017 EMG was negative for cervical or lumbar radiculopathy or peripheral nerve involvement.  (Tr. 558).

On September 13, 2017, Fitzwater told Dr. Palma that she had anxiety, fatigue, and panic attacks twice a week, but she was improving and tolerated her treatment well.  (Tr. 625).  Fitzwater also reported having 4/10 pain in her neck.  (Tr. 625).  Examination showed normal posture, gait, and station.  (Tr. 626).

On September 25, 2017, Fitzwater told James Diekroger, MD, that she had back and shoulder pain, but she was not doing the exercises as recommended.  (Tr. 653).  Dr. Diekroger diagnosed Fitzwater with chronic bilateral low back pain with right-sided sciatica.  (Tr. 653).  Examinations on September 25 and October 1, 2017, showed full range of motion with decreased strength on straight leg raise, normal gait, straight back, and no bony tenderness.  (Tr. 477, 656).  Dr. Diekroger also recommended that Fitzwater exercise.  (Tr. 477, 656).

On December 7, 2017, Fitzwater saw Lauren McGowan, LPCC-S, for a behavioral health assessment on referral from Dr. Golembiewski.  (Tr. 638-42).  Fitzwater reported having anxiety and depression.  (Tr. 638).  She reported inconsistent mood, minimal sleep, changing diet, and inconsistent concentration and focus.  (Tr. 638).  She also reported anhedonia, irritability, excessive worry, panic attacks, social anxiety, and trauma-related flashbacks.  (Tr. 639). Examination showed normal posture, behavior, mood, affect, orientation, judgment, insight, memory, attention, concentration, and thought content.  (Tr. 641-42).  On March 27, 2018, McGowan noted that Fitzwater had normal thought process/content, cooperative/calm behavior, normal speech, thoughtful/logical judgment, good insight, and the ability to verbalize feelings and thoughts.  (Tr. 805).

On May 1, 2018, Fitzwater told Dr. Golembiewski that she'd been sick for weeks and had excess stress.  (Tr. 923).  Examination showed full orientation, antalgic gait, and ambulation with a cane, but no other physical symptoms were noted.  (Tr. 925).  At follow-ups on August 27, 2018, and January 15 and February 19, 2019, Dr. Golembiewski noted that Fitzwater walked with a cane and examination showed full orientation, antalgic gait, full strength in the upper extremities, 4/5 strength in her lower extremities, intact sensation, diffuse tenderness in the lumbar spine, normal muscle tone, normal coordination, normal mood/affect, and normal behavior.  (Tr. 917, 939, 960).  On January 15, 2019, Fitzwater told Dr. Golembiewski that she didn't like taking medication because it gave her an upset stomach.  (Tr. 938).  On March 19, 2019, Dr. Golembiewski noted that examination showed antalgic gait and that Fitzwater was "tender to light touch diffusely on back; shift[ed] in [her] chair frequently; had 5/5 strength in all extremities, normal mood/affect, and normal behavior.  (Tr. 947).  Dr. Golembiewski also noted that Fitzwater had "pain with active [range of motion] limits [for the] duration of strength testing."  (Tr. 947).  The same record noted Fitzwater's August 2017 EMG that was "neg for

cervical or lumbar radiculopathy or peripheral nerve involvement" but set forth an "Assessment and Plan" that included a diagnosis of "M54.12 Cervical radiculopathy and M54.16 Lumbar radiculopathy."  (*Id.*)

### C.    Relevant Opinion Evidence

#### 1.    Treating Physician – Dr. Golembiewski

On March 19, 2019, Dr. Melanie Golembiewski completed a "medical source statement." (Tr. 943-44).  Dr. Golembiewski indicated that Fitzwater could lift up to 15 pounds occasionally and 10 pounds frequently; stand/walk for up to 1-hour total and 30 minutes uninterrupted; and sit for up to 2 hours total and 30 minutes uninterrupted.  (Tr. 943).  Fitzwater could rarely climb, balance, stoop, crouch, kneel, crawl, reach, push, or pull.  (Tr. 943-44).  She could occasionally perform fine and gross manipulation.  (Tr. 944).  She could not tolerate moving machinery or temperature extremes.  (Tr. 944).  Her severe pain would interfere with her concentration, cause her to be off-task, and cause absenteeism.  (Tr. 944).  Fitzwater needed to be able to change positions at will and lift her legs to 45 degrees at will.  (Tr. 944).  Dr. Golembiewski also indicated that Fitzwater would require a 5 to 10-minute break every 15 to 30 minutes.  (Tr. 944).

#### 2.    Treating Physician – Dr. Placeway

On March 28, 2018, Dr. Jared Placeway completed a "medical source statement" and filled out notes for a "disability eval[uation]."  (Tr. 808-09, 896-97).  Dr. Placeway indicated that Fitzwater could lift less than 5 pounds frequently, 5 pounds occasionally, and up to 20 pounds "very infrequently."  (Tr. 808, 896).  The statement indicated that Fitzwater could stand and walk for up to 2 hours in workday and 15 minutes without interruption, but the evaluation notes indicated that she could only stand for 1 hour total, walk for 30 minutes total, and walk for 10 minutes at a time.  (Tr. 808, 896).  The statement indicated that Fitzwater could sit for up to 4 hours total and 45 minutes at a time, but the evaluation notes indicated that she could sit for only

2 hours total and 30 minutes at a time.  (Tr. 808, 896).  The statement indicated that Fitzwater could rarely climb, balance, stoop, crouch, kneel, and crawl; occasionally reach, push, and pull; and frequently perform fine and gross manipulation.  (Tr. 808).  The disability evaluation indicated that Fitzwater would have difficulty bending forward and twisting or stooping would increase her pain.  (Tr. 896-97).  Dr. Placeway indicated that Fitzwater had moderate/severe pain, which would interfere with her concentration, cause her to be off-task, and cause absenteeism.  (Tr. 809).  He indicated that Fitzwater would need to be able to alternate positions between sitting, standing, and walking; elevate her legs at will; and take 30 minutes of breaks beyond the normal work breaks.  (Tr. 809).  In his treatment notes from the same day, Dr. Placeway stated that Fitzwater's back pain and associated hand paresthesias "significantly limit[ed] her ability to perform even sedentary jobs."  (Tr. 901).

### 3.    Treating Counselor –Peticca

On May 5, 2015, Chelsea Peticca, LPC-CR, completed a "daily activities questionnaire." (Tr. 359-60).  Peticca indicated that Fitzwater had no concerns getting along with family or friends and was able to get along well with employers and supervisors.  (Tr. 359).  She noted that Fitzwater reported getting let go from previous jobs because she wasn't able to keep up with productivity or learn her job quick enough.  (Tr. 539).  Peticca indicated that Fitzwater's poor stress tolerance, anxiety, fluctuating mood, depression, and occasional hallucinations would impact her ability to work.  (Tr. 359).  Peticca indicated that Fitzwater was able to prepare meals, complete chores at a slower pace, drive, pay bills with assistance from her husband, and keep all her appointments.  (Tr. 360).

### 4.    Treating Counselor – McGowan

On March 27, 2018, Lauren McGowan, PRC-S, completed a "medical source statement – medical capacity" form.  (Tr. 800-01).  McGowan indicated that Fitzwater had marked

limitations in her ability to work a full day without needing extra breaks or rest periods.  (Tr. 801).  She had a mild limitation in responding to demands.  She had moderate limitations in recognizing and correcting mistakes, identifying and solving problems, sequencing multi-step activities, handling conflicts, responding to requests and criticism, keeping social interactions free of irritability and sensitivity, ignoring or avoiding distractions, changing activities or work settings, working close to or with others without distracting them, sustaining an ordinary routine and regular attendance, adapting to changes, and managing her own psychological symptoms.  (Tr. 800-01).  She had no limitation in understanding and learning instructions or procedures, following 1 or 2 step instructions, describing activity to someone else, asking and answering questions, using reason and judgment, cooperating with others, sustaining conversation, responding to social cues, initiating and performing tasks that she knew how to do, working at an appropriate and consistent pace, completing tasks in a timely manner, distinguishing between acceptable and unacceptable performance, setting realistic goals, making independent plans, maintaining hygiene, and being aware of normal hazards.  (Tr. 800-01).

### 5.    Treating Psychologist – Deborah Koricke, Ph.D.

On May 12, 2015, Deborah Koricke, Ph.D., completed a "mental status questionnaire. (Tr. 356-58).  Dr. Koricke said that she had first seen Fitzwater in September 2014 and last saw her in May 2015.  (Tr. 356).  She said that Fitzwater was appropriately groomed during treatment, had clear speech, and had full range affect (sometimes tearful). (Tr. 356).  Dr. Koricke said that Fitzwater had average intelligence, difficulty concentrating, and difficulty with memory.  (Tr. 356).  She said that Fitzwater would have difficulty following directions, retaining information, maintaining attention, and completing tasks in a timely manner.  (Tr. 357).  She said that Fitzwater would have increased anxiety in social situations and difficulty adapting to new environments or social situations.  (Tr. 357).  Dr. Koricke also said that Fitzwater would have

12

limitations in reacting to work pressures when performing simple, routine, or repetitive tasks. (Tr. 357).

### 6.    Examining Psychologist – Katherine Alouani, Psy.D.

On November 9, 2017, Katherine Alouani, Psy.D., completed a consultative examination to assess Fitzwater's mental health capacity.  (Tr. 609-19).  Dr. Alouani noted that Fitzwater had fluent speech, normal posture, no evidence of hallucinations, coherent and goal directed thought process, full range affect, appropriate thought content, euthymic mood, full orientation, mildly impaired attention/concentration, mildly impaired remote memory skills, mildly impaired working memory, and below average intelligence.  (Tr. 612-13).  She noted that Fitzwater reported significant anxiety symptoms and PTSD, and that she had reported difficulty carrying out instructions in work settings.  (Tr. 613, 615).  Dr. Alouani stated that Fitzwater did not report symptoms related to attention and concentration, but her cognitive limitations would impair her ability to perform "more complex tasks."  (Tr. 615).  Fitzwater had limited skills in managing work related pressures.  (Tr. 615, 619).

### 7.    State Agency Consultants

On November 22, 2017, state agency medical consultant Dimitri Teague, MD, evaluated Fitzwater's physical capacity based on a review of her medical records.  (Tr. 92-93).  Dr. Teague determined that Fitzwater could lift up to 20 pounds occasionally and 10 pounds frequently; stand/walk for up to 6 hours in an 8-hour workday; sit for up to 6 hours in an 8-hour workday; and push/pull without limitation.  (Tr. 92).  She could never climb ladders/ropes/scaffolds; occasionally crawl and climb ramps/stairs; and frequently balance, stoop, kneel, and crouch.  (Tr. 92).  She did not have any manipulative, visual, or communicative limitations.  (Tr. 92).  She was to avoid all exposure to hazards such as machinery and heights, but she had no other

environmental limitations.  (Tr. 92-93).  On March 15, 2018, Leigh Thomas, MD, concurred with Dr. Teague's opinion.  (Tr. 130-31).

On November 22, 2017, state agency psychological consultant Irma Johnston, Psy.D., evaluated Fitzwater's mental health capacity based on a review of her medical records.  (Tr. 89-90).  Dr. Johnston determined that Fitzwater had moderate impairment in understanding, remembering, and applying information; interacting with others; concentrating, persisting, or maintaining pace; and adapting or managing herself.  (Tr. 89).  Dr. Johnston said that Fitzwater was not significantly limited in her ability remember locations and work-like procedures; understand and remember very short and simple instructions; carry out very short and simple instructions; perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; sustain an ordinary routine without special supervision; make simple work-related decisions; ask simple questions or request assistance; get along with coworkers or peers without distracting them or exhibiting behavioral extremes; maintain socially appropriate behavior; adhere to basic standards of neatness and cleanliness; be aware of normal hazards and take appropriate precautions; travel in unfamiliar places or use public transportation; and set realistic goals or make plans independently of others.  (Tr. 94-95).  She was moderately limited in her ability to understand and remember detailed instructions; carry out detailed instructions; maintain attention and concentration for extended periods; work in coordination with or in proximity to others without being distracted by them; complete a normal workday and workweek without interruptions from psychologically based symptoms; perform at a constant pace without an unreasonable number and length of rest periods; interact appropriately with the general public; accept instructions and respond appropriately to criticism from supervisors; and respond appropriately to changes in the work setting.  (Tr. 94-95).  Dr. Johnston additionally explained that Fitzwater could: (1) perform simple, repetitive tasks with no production quota;

14

(2) should be limited to interacting superficially and occasionally with coworkers, supervisors, and the general public; and (3) should be exposed to changes gradually and infrequently.  (Tr. 94-95).  On March 13, 2018, Paul Tangeman, Ph.D., concurred with Dr. Johnston's opinion.  (Tr. 127, 132-33).

## III.  The ALJ's Decision

On August 8, 2019, the ALJ issued a written decision denying Fitzwater's claims.  (Tr. 16-40).  The ALJ made the following paraphrased findings relevant to Fitzwater's arguments in this case:

> 5.  Fitzwater had the residual functional capacity to perform light work, except that she could never climb ladders, ropes, or scaffolds; occasionally climb ramps and stairs; frequently balance, stoop, and crouch; occasionally crawl; avoid all exposure to working around heavy machinery or operating heavy machinery, like power saws and jack hammers; no commercial driving; no work at unprotected heights; limited to simple instructions; limited to a routine and repetitive work environment; no mechanized pace for time or quantity; and limited to speaking, signaling, and asking questions.  In making this finding, the ALJ "considered all symptoms" in light of the medical and other evidence.  (Tr. 26-27).
>
> Dr. Teague's and Dr. Thomas's opinions were found to be persuasive because they were supported by evidence that those doctors had reviewed, and they were consistent with other evidence in the record.  (Tr. 33).
>
> Dr. Golembiewski's and Dr. Placeway's opinions were found to be unpersuasive because: (1) EMG testing showed no evidence of radiculopathy in the upper or lower extremities; (2) examination findings that showed full strength, range of motion, sensation, and reflexes conflicted with the opinions on standing, walking, and lifting limitations; (3) Dr. Golembiewski's own examination findings that showed full strength in some extremities despite pain didn't support the relatively extreme limitations in her opinion; (4) the state agency consultants' opinions conflicted with her opinion; and (5) Dr. Golembiewski and Dr. Placeway didn't provide a detailed explanation (other than pain in Dr. Golembiewski's opinion) for their opinions regarding absenteeism and off-task behavior.  (Tr. 34).
>
> Parts of Dr. Johnston's and Dr. Tangeman's opinions were persuasive.  The "moderate findings" were supported by the evidence of record, but the specific limitations described in their opinions were vague, imprecise, and undefined.  (Tr. 35).
>
> Dr. Alouani's opinion was "less persuasive."  The complex tasks, interaction, and pressure management limitations were supported by evidence in the record, but

other portions of Dr. Alouani's opinion were vague, did not use appropriate terminology, and were not supported by Dr. Alouani's examination findings.  (Tr. 36).

McGowan's opinion was persuasive, except for the parts in which she described "marked limitations."  Peticca's opinion was "less persuasive."  (Tr. 36).

And Dr. Koricke's opinion was unpersuasive because it was inconsistent with examination findings and other medical evidence.  (Tr. 37).

Based on those findings – as well as VE testimony that an individual with Fitzwater's RFC, age, and background could work as a marker, office cleaner, and produce weigher – the ALJ found that Fitzwater was not disabled from August 15, 2012, through August 8, 2019.  (Tr. 39-40).

## IV.    Law & Analysis

### A.    Standard of Review

The court reviews the Commissioner's final decision to determine whether it was supported by substantial evidence and whether proper legal standards were applied.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007). "Substantial evidence" is not a high threshold for sufficiency.  *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019).  "It means – and means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'"  *Id.* (quoting *Consolidated Edison Co. v. NLRB*, 305 U.S. 197, 229 (1938)).  Even if a preponderance of the evidence supports the claimant's position, the Commissioner's decision still cannot be overturned "'so long as substantial evidence also supports the conclusion reached by the ALJ.'"  *O'Brien v. Comm'r of Soc. Sec.*, 819 F. App'x 409, 416 (6th Cir. Aug 7, 2020) (quoting *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 477 (6th Cir. 2003)).  Under this standard, the court cannot decide the facts anew, evaluate credibility, or re-weigh the evidence.  *Jones*, 336 F.3d at 476.  And "it is not necessary that this court agree with the Commissioner's finding," so long as it meets this low standard for evidentiary support.  *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783 ("It is not our

role to try the case de novo." (quotation omitted)).  This is so because the Commissioner enjoys a "zone of choice" within which to decide cases without being second-guessed by a court.  *Mullen v. Bowen*, 800 F.2d 535, 545 (6th Cir. 1986).

Even if substantial evidence supported the ALJ's decision, the court will not uphold that decision when the Commissioner failed to apply proper legal standards, unless the legal error was harmless.  *Bowen v. Comm'r of Soc. Sec.*, 478 F.3d 742, 746 (6th Cir. 2006) ("[A] decision . . . will not be upheld [when] the SSA fails to follow its own regulations and [when] that error prejudices a claimant on the merits or deprives the claimant of a substantial right."); *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 654 (6th Cir. 2009) ("Generally, . . . we review decisions of administrative agencies for harmless error.").  Furthermore, the court will not uphold a decision, when the Commissioner's reasoning does "not build an accurate and logical bridge between the evidence and the result."  *Fleischer v. Astrue*, 774 F. Supp. 2d 875, 877 (N.D. Ohio 2011) (quoting *Sarchet v. Charter*, 78 F.3d 305, 307 (7th Cir. 1996)); *accord Shrader v. Astrue*, No. 11-13000, 2012 U.S. Dist. LEXIS 157595 (E.D. Mich. Nov. 1, 2012) ("If relevant evidence is not mentioned, the court cannot determine if it was discounted or merely overlooked."); *McHugh v. Astrue*, No. 1:10-CV-734, 2011 U.S. Dist. LEXIS 141342 (S.D. Ohio Nov. 15, 2011); *Gilliams v. Astrue*, No. 2:10 CV 017, 2010 U.S. Dist. LEXIS 72346 (E.D. Tenn. July 19, 2010); *Hook v. Astrue*, No. 1:09-CV-19822010, 2010 U.S. Dist. LEXIS 75321 (N.D. Ohio July 9, 2010).  Requiring an accurate and logical bridge ensures that a claimant, as well as a reviewing court, will understand the ALJ's reasoning.

The Social Security regulations outline a five-step process the ALJ must use to determine whether a claimant is entitled to benefits: (1) whether the claimant is engaged in substantial gainful activity; (2) if not, whether the claimant has a severe impairment or combination of impairments; (3) if so, whether that impairment, or combination of impairments, meets or equals

any of the listings in 20 C.F.R. Part 404, Subpart P, Appendix 1; (4) if not, whether the claimant

can perform she past relevant work in light of his RFC; and (5) if not, whether, based on the

claimant's age, education, and work experience, she can perform other work found in the

national economy.  20 C.F.R. § 404.1520(a)(4)(i)-(v)[2]; *Combs v. Comm'r of Soc. Sec.*, 459 F.3d

640, 642-43 (6th Cir. 2006).  Although it is the Commissioner's obligation to produce evidence

at Step Five, the claimant bears the ultimate burden to produce sufficient evidence to prove that

she is disabled and, thus, entitled to benefits.  20 C.F.R. § 404.1512(a).

> ### B.      Dr. Placeway's and Dr. Golembiewski's Opinions[3]

Fitzwater argues that the ALJ failed to apply proper legal standards and reach a decision

supported by substantial evidence in rejecting Dr. Placeway's and Dr. Golembiewski's opinions.

ECF Doc. 15 at 14-16.  Fitzwater asserts that the ALJ should have adopted these physicians'

opinions that she had limited ability to lift more than 10 pounds, could stand only a few hours,

needed a cane, needed a sit/stand option, needed to elevate her legs when seated, and had

work-preclusive limitations in attendance, off-task behavior, and number/length of breaks.  ECF

Doc. 15 at 14, 16 & n.2.  Fitzwater contends that the ALJ improperly adopted state agency

consultants' opinions (which didn't include these limitations) because the regulatory factors in

20 C.F.R. § 404.1527(d)(2) – namely the length/frequency of treatment, supportability, and

consistency – supported giving greater weight to Dr. Placeway's and Dr. Golembiewski's

---

[2] The regulations governing DIB claims are found in 20 C.F.R. § 404, *et seq.* and the regulations governing SSI claims are found in 20 C.F.R. § 416, *et seq.*  Generally, these regulations are duplicates and establish the same analytical framework.  For ease of analysis, this R&R cites only the relevant regulations in 20 C.F.R. § 404, *et seq.* unless there is a material difference in the regulations.
[3] In addition to his substantively responsive arguments, the Commissioner also points out that both of Fitzwater's arguments cite the wrong medical opinion standard.  ECF Doc. 17 at 14, 23.  The Commissioner is right.  The "good reasons" requirement and two-part controlling and ultimate weight analysis set out in 20 C.F.R. § 404.1527(c) and *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 376 (6th Cir. 2013), don't apply in this case.  But, fly swatting aside, Fitzwater's arguments (challenging the ALJ's *consistency* findings and substantial evidence related to the medical opinion evidence) fit well within the prevailing regulatory framework.  There's no need to rub her nose in her mistaken citations any further.

opinions.  ECF Doc. 15 at 14-16.  Specifically, Fitzwater asserts that Dr. Placeway's and Dr. Golembiewski's opinions were consistent with: (1) objective records showing restricted range of motion, extremity weakness, spinal and shoulder abnormalities; and (2) her consistent reports of severe pain that didn't respond to medication or injections and resulted in her chronic pain syndrome diagnosis.  ECF Doc. 15 at 15-16.  The Commissioner disagrees, offering standard, boilerplate responses.  ECF Doc. 17 at 14-19.

At Step Four of the sequential analysis, the ALJ must determine a claimant's RFC by considering all relevant medical and other evidence.  20 C.F.R. § 404.1520(e).  On January 18, 2017, the Social Security Administration amended the rules for evaluating medical opinions for claims filed after March 27, 2017.  *See Revisions to Rules Regarding the Evaluation of Medical Evidence*, 82 Fed. Reg. 5844 (Jan. 18, 2017).  The new regulations provide that the Social Security Administration "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s) or prior administrative medical finding(s)."  20 C.F.R. § 404.1520c(a).  Nevertheless, an ALJ must "articulate how [she] considered the medical opinions and prior administrative medical findings" in adjudicating a claim.  20 C.F.R. § 404.1520c(a).  In doing so, the ALJ is required to explain how she considered the supportability and consistency of a source's medical opinion(s), but generally is not required to discuss other factors.  20 C.F.R. § 404.1520c(b)(2).  If the ALJ finds that two or more medical opinions "are both *equally well-supported and consistent* with the record but are not exactly the same," the ALJ must articulate what factors were most persuasive in differentiating the opinions. 20 C.F.R. § 404.1520c(b)(3) (internal citations omitted) (emphasis added).  Other factors include: (1) the length, frequency, purpose, extent, and nature of the source's relationship to the client; (2) the source's specialization; and (3) "other factors," such as familiarity with the disability program and other evidence in the record.  20 C.F.R. § 404.1520c(c)(3)-(5).

19

Consistency concerns the degree to which the opinion reflects the same limitations described in evidence from other sources, whereas supportability concerns the relevancy of objective medical evidence and degree of explanation given by the medical source to support the limitations assessed in the opinion.  *See* 20 C.F.R. § 404.1520c(c)(1)-(2).

The ALJ applied proper legal standards in evaluating Dr. Golembiewski's and Dr. Placeway's opinions.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  The ALJ properly declined to give any specific weight (including controlling weight) to any medical opinion or prior administrative findings.  (Tr. 33); 20 C.F.R. § 404.1520c(a).  Instead, the ALJ complied with the new regulations when she explained that she found Dr. Golembiewski's and Dr. Placeway's opinions unpersuasive in light of conflicting (or inconsistent) evidence and specifically described the evidence she found inconsistent with their opinions.  (Tr. 34); 20 C.F.R. § 404.1520c(a), (b).  This explanation fit well within the regulatory framework. It also provided an accurate and logical bridge to allow us to understand the ALJ's reasoning. *Fleischer*, 774 F. Supp. 2d at 877; 20 C.F.R. § 404.1520c.  Further, the regulations did not require the ALJ to give greater weight to Dr. Golembiewski's and Dr. Placeway's opinions (or find them more persuasive) than she assigned the state agency reviewer's opinions just because Dr. Golembiewski and Dr. Placeway were treating sources.  *See generally* 20 C.F.R. § 404.1520c.  Instead, the length and nature of the sources' relationships with Fitzwater never came into play because the ALJ didn't find that Dr. Golembiewski's and Dr. Placeway's opinions were equally consistent with record evidence or were as well supported as the state agency consultants' opinions.  20 C.F.R. § 404.1520c(b)(3).

Substantial evidence also supported the ALJ's finding that Dr. Golembiewski's and Dr. Placeway's opinions were unpersuasive because they were inconsistent with other evidence in the record.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.1520c; *Rogers*, 486 F.3d at 241.

A reasonable mind could find that the significant physical limitations described in Dr. Golembiewski's and Dr. Placeway's opinions were inconsistent with:  (1) the August 2017 EMG showing no evidence of radiculopathy in Fitzwater's upper or lower extremities; (2) Dr. Golembiewski's examination findings that Fitzwater had normal range of motion, normal reflexes, no cervical adenopathy, and no edema or tenderness; (3) Dr. Placeway's findings that Fitzwater had full range of motion in all extremities, normal gait, no soft tissue swelling, and full shoulder range of motion without pain; (4) other providers' regular examination findings that Fitzwater had normal range of motion, full strength, the ability to move all extremities symmetrically, normal tone, normal sensation, normal gait, normal rotator cuff, and a stable shoulder; (5) Fitzwater's statement that she had "nice relief" from pain after steroid injections; (6) Dr. Shaia's notes that Fitzwater showed marked improvement after a trigger point injection, didn't have much pain, and had a non-antalgic gait with no focal motor deficits; (7) MRIs and x-rays showing mild findings and no significant stenosis or cord compression.  (Tr. 350, 387, 391, 415, 437, 464, 467, 471, 477-79, 483, 490, 494, 496, 553-54, 558, 564, 568, 573, 576-77, 592, 626, 656, 704, 791, 900-01, 917, 939, 947, 960); *Biestek*, 139 S. Ct. at 1154.  That Fitzwater has pointed to other evidence that might have supported a different conclusion is unavailing.  Even if a preponderance of the evidence would have supported a finding that Dr. Golembiewski's and Dr. Placeway's opinions were persuasive – and even if we might have agreed with Fitzwater on *de novo* review – this court is not permitted to decide the facts anew or re-weigh the evidence. *O'Brien*, 819 F. App'x 416; *Jones*, 336 F.3d at 476-77.  Because the ALJ's finding meets the low threshold for evidentiary support, it fell within the Commissioner's "zone of choice" and we cannot second-guess the ALJ's findings.  *Mullen*, 800 F.2d at 545; *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783.

I recommend that the ALJ's finding that Dr. Golembiewski's and Dr. Placeway's opinions were not persuasive be affirmed.

### C.    Dr. Koricke's and Dr. Alouani's Opinions

Next, Fitzwater argues that the ALJ erred in her analysis of the opinions of consulting examiners Dr. Koricke and Dr. Alouani.  ECF Doc. 15 at 16-18.  Fitzwater asserts that the ALJ should have adopted the consultative examiners' opinions that she had limitations in social interaction, concentration, persistence, pace, and adaptation, but instead limited her only to simple, routine, repetitive, and quota-less work.  ECF Doc. 15 at 16-17.  She contends that the ALJ's decision to discount Dr. Koricke's and Dr. Alouani's opinions was the result of improper "cherry picking" because the ALJ relied on evidence unrelated to the limitations in those opinions.  ECF Doc. 15 at 17-18.  Specifically, Fitzwater argues that the ALJ: (1) relied on findings that she was able to take care of her personal hygiene, could pay bills with her husband's help, had coherent speech, and could maintain eye contact; and (2) ignored more probative evidence showing difficulty performing everyday tasks, anxiety, depression, nightmares, lack of motivation, auditory hallucinations, and poor stress tolerance.  ECF Doc. 15 at 17-18.  The Commissioner responds in opposition to each of these points.  ECF Doc. 17 at 19-23.

The ALJ applied proper legal standards in her evaluation of Dr. Koricke's and Dr. Alouani's opinions.  42 U.S.C. §§ 405(g), 1383(c)(3); *Rogers*, 486 F.3d at 241.  As discussed above, the ALJ properly declined to give any specific weight (including controlling weight) to any medical opinion or prior administrative findings.  (Tr. 33); 20 C.F.R. § 404.1520c(a).  Instead, the ALJ complied with the new regulations when she found that: (1) Dr. Koricke's opinion was unpersuasive because it was inconsistent with examination findings and other medical evidence; and (2) Dr. Alouani's opinion (other than the complex tasks, interaction, and

pressure management limitations) was less persuasive because it used vague or inappropriate terminology and wasn't supported by his own examination findings.  (Tr. 36-37); 20 C.F.R. § 404.1520c(a), (b).  The explanation that Dr. Koricke's and Dr. Alouani's opinions were inconsistent with objective medical evidence in the record fell squarely within the analysis prescribed by the regulations.  20 C.F.R. § 404.1520c.  And the Sixth Circuit has recognized as a reasonable basis for discounting a medical opinion the ALJ's additional reason for discounting Dr. Alouani's opinion (that it was vague and not given in defined terms).  *See*, *e.g.*, *Gaskin v. Comm'r of Soc. Sec.*, 280 F. App'x 472, 476 (6th Cir. 2008); *Quisenberry v. Comm'r of Soc. Sec.*, 757 F. App'x 422, 431 (6th Cir. 2018).  This explanation provided a sufficiently accurate and logical bridge to allow a subsequent reviewer to understand the ALJ's reasoning.  *Fleischer*, 774 F. Supp. 2d at 877.  Further, as discussed above, the ALJ wasn't required to find Dr. Koricke's and Dr. Alouani's opinions more persuasive than the state agency consultants' opinions merely on the basis of their treating/examining relationship.  *See generally* 20 C.F.R. § 404.1520c.

Substantial evidence also supported the ALJ's conclusion that Dr. Koricke's and Dr. Alouani's opinions were unpersuasive.  42 U.S.C. §§ 405(g), 1383(c)(3); 20 C.F.R. § 404.1520c; *Rogers*, 486 F.3d at 241.  A reasonable mind could find that the limitations in Dr. Koricke's opinion were inconsistent with:  (1) Counselor Peticca's findings that Fitzwater had cooperative attitude, logical thought process, unimpaired, cognition, and average intelligence; (2) Counselor McGowan's findings that Fitzwater had normal behavior, orientation, judgment, insight, memory, attention, concentration, and thought content; (3) McGowan's opinion that Fitzwater had no limitation in understanding and learning instructions or procedures, following 1 or 2 step instructions, answering questions, cooperating with others, sustaining conversations, responding to social cues, working at an appropriate and consistent pace, setting

23

realistic goals, and making independent plans; (4) Fitzwater's statements denying memory loss

and indicating that she felt well or improved after mental health treatment; and (5) regular

findings that Fitzwater was cooperative and had normal behavior, normal affect, full orientation,

normal judgment, and normal thought content.  (Tr. 372-73, 377, 387, 391, 409-10, 420, 424,

478-79, 483, 490, 494, 496, 641-42, 625, 800-01, 805, 917, 939, 947, 960); *Biestek*, 139 S. Ct. at

1154.  A reasonable mind could also find that Dr. Alouani's opinion that Fitzwater had an

impaired ability to perform "more complex tasks" and had limited skills in managing work

related pressures was inconsistent with his own examination findings that: (1) she didn't report

any symptoms related to attention and concentration; and (2) she had fluent speech, coherent and

goal directed thought process, full range affect, appropriate thought content, and only mild

impairments in attention, concentration, remote memory, and working memory.  (Tr. 612-13,

615, 619); *Biestek*, 139 S. Ct. at 1154.  Further, because Dr. Alouani didn't specifically describe

the *degree* of impairment in managing work pressures and performing tasks, a reasonable mind

could find the vague descriptions of impairments unpersuasive (or at least not useful) for

purposes of establishing Fitzwater's RFC.  (Tr. 615, 619); *Gaskin*, 280 F. App'x at 476;

*Quisenberry*, 757 F. App'x 431.

The ALJ also didn't improperly "cherry pick" evidence.  Here, Fitzwater misrepresents

the record in stating that the ALJ improperly related on non-probative evidence that she could

take care of her personal hygiene, pay bills with her husband's help, and maintain eye contact in

discounting Dr. Alouani's and Dr. Koricke's opinions.  But the ALJ didn't do that.[4]  As

discussed above, the ALJ specifically found that Dr. Alouani's opinion was inconsistent with his

---

[4] The ALJ did cite the evidence Fitzwater calls non-probative in describing why he found *Peticca's* opinion less persuasive.  (Tr. 36).  But Fitzwater hasn't argued that the ALJ failed to properly weigh *Peticca's* opinion.  *See generally* ECF Doc. 15.  Thus, any such argument is forfeited.  *Swain v. Comm'r of Soc. Sec.*, 379 F. App'x 512, 517 (6th Cir. 2010).

own examination findings.  (Tr. 36).  And the ALJ specifically found that Dr. Koricke's opinion was inconsistent with "the examination findings and other persuasive portions of the medical evidence [that didn't] support any significant deficits in any areas of mental functioning.  (See e.g., exam findings at 10F/5-6, 12F/9-10, 16F/4, 7F/7, 9 and 15, and 8F/14 and 16 . . .)."  (Tr. 37).  In other words, Fitzwater's "cherry picking" argument essentially amounts to nothing more than a request that the court reweigh record evidence, which this court cannot do.  *Chicora v. Comm'r of Soc. Sec.*, No. 20-1827, 2021 U.S. App. LEXIS 12064, at *9-10 (6th Cir. 2021) (citing *DeLong v. Comm'r of Soc. Sec.*, 748 F.3d 723, 726 (6th Cir. 2014).  Even a cursory review of ALJ Loucas's exhaustive analysis shows that she considered all the evidence and did not engage in cherry picking.

Likewise, Fitzwater's citation to evidence that might have supported a different conclusion is unavailing – even if most of the evidence in the record would have supported a finding that Dr. Koricke's and Dr. Alouani's opinions were persuasive.  *O'Brien*, 819 F. App'x 416; *Jones*, 336 F.3d at 476-77.  Because the ALJ's finding meets the low threshold for evidentiary support, it fell within the Commissioner's "zone of choice" and cannot be second-guessed by this court.  *Mullen*, 800 F.2d at 545; *Rogers*, 486 F.3d at 241; *see also Biestek*, 880 F.3d at 783.

Accordingly, the ALJ's decision to discount Dr. Koricke's and Dr. Alouani's opinions should be affirmed.

## V.     Recommendation

Because the ALJ applied proper legal standards and reached a decision supported by substantial evidence, I recommend that the Commissioner's final decision denying Fitzwater's applications for DIB and SSI be AFFIRMED.

Dated: June 4, 2021

Thomas M. Parker
United States Magistrate Judge

---

### OBJECTIONS

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document.  Failure to file objections within the specified time may waive the right to appeal the District Court's order.  See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981).  See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).